UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ALEXANDER RILEY,

                              Plaintiff,

                v.

THE CITY OF NEW YORK, POLICE OFFICER
JOSEPH DESANTIS, DETECTIVE WILMAR
MEJIA, UNDERCOVER OFFICER 27598, and
SERGEANT ROBERT FERNANDEZ,

                           Defendants.

**MEMORANDUM & ORDER**
10-CV-2513(MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Alexander Riley, brings this action against Defendants City of New York, Police Officer Joseph DeSantis, Detective Wilmar Mejia, Undercover Officer 27598 and Sergeant Robert Fernandez, alleging violations of the Fourth and Sixth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. Plaintiff alleges claims of false arrest, excessive force, unlawful search, "fabrication of evidence," and municipal liability against the City of New York. (Am. Compl. ¶¶ 30–54.) Defendants moved before Magistrate Judge Robert M. Levy pursuant to Rules 37 and 41(b) of the Federal Rules of Civil Procedure and the Court's inherent power for dismissal of the Amended Complaint as a sanction against Plaintiff for Plaintiff's alleged witness tampering in violation of 18 U.S.C. § 1512(b)(1). By Report and Recommendation ("R&R") dated November 4, 2013, Judge Levy recommended that the Court dismiss the Amended Complaint as a sanction against Plaintiff for witness tampering. Plaintiff timely filed objections to the R&R. For the reasons set forth below, the Court adopts the R&R in part and declines to adopt it in part. The Court adopts Judge Levy's conclusion that Plaintiff

engaged in witness tampering, but denies Defendants' motion to dismiss the Complaint.

## I. Background

### a. Allegations in the Amended Complaint

On February 27, 2008, at approximately 6:15 PM, Plaintiff left a barbershop on Neptune Avenue in Brooklyn and entered his car which was parked in front of the barbershop.[1] (Am. Compl. ¶ 7.) Before Plaintiff could leave the location in his car, DeSantis, Mejia and Fernandez arrived in a police van. (*Id.* ¶ 9.) One of the Defendants "violently pulled" Plaintiff out of his car and "struck" him in the head with a "blunt object, causing [him] to fall to the ground." (*Id.* ¶ 10.) While Plaintiff was on the ground, the same Defendant handcuffed him "excessively tight[ly] causing pain and bruising." (*Id.* ¶ 11.) DeSantis then "punched and kicked [Plaintiff] numerous times on the head, face and body" while the other Defendants watched and "failed to intervene to protect" Plaintiff. (*Id.* ¶¶ 12–13.) Defendants subsequently "arrested [P]laintiff for no reason." (*Id.* ¶ 14.)

After arriving at the 60th Precinct, Plaintiff was taken to Coney Island Hospital where he received five stitches. (*Id.* ¶ 16.) "[P]ursuant to an agreement with the other [D]efendants," DeSantis misrepresented in police reports and to the Kings County District Attorney's Office that "[P]laintiff was found in possession of a controlled substance and pre-recorded buy money and had resisted arrest." (*Id.* ¶¶ 17, 19.) Plaintiff was charged with possession of a controlled substance and resisting arrest. (*Id.* ¶ 20.) After being admitted to Rikers Island Correctional Facility, correction officers "illegally strip searched [P]laintiff with a group of other inmates." (*Id.* ¶ 23.) The strip search was improper because "[P]laintiff was a pre-trial detainee charged only with misdemeanors, the correction officers had no reason to believe that [P]laintiff was

---

[1] The Court recites the facts as alleged in the Amended Complaint.

hiding illegal items under his clothes, and the search was not conducted in private."  (*Id.* ¶ 25.)

### b.  Relevant procedural issues

On September 23, 2010, Plaintiff provided Defendants with his initial disclosures "pursuant to F.R.C.P. 26(a)."[2]  (Pl. Disclosures, annexed to Declaration of Raju Sundaran in Support of Defendants' Prop. Findings of Fact & Conclusions of Law ("Sundaran Decl.") as Ex. E.)  Plaintiff identified the "Coney Island Hospital doctors and nurses" and "Woodhull Hospital doctors and nurses" as non-party witnesses to the alleged incident.  (*Id.*)

On November 26, 2010, Plaintiff responded to Defendants' First Set of Interrogatories and Requests for Production of Documents, which requested the identification of "all persons who witnessed, were present at, or have knowledge of the incident."  (Pl. Resp. to Def. First Set of Interrog. 1, annexed to Sundaran Decl. as Ex. F.)  Plaintiff identified "Coney Island Hospital doctors and nurses including Dr. Alfredo Wong, Radiologist Deepak Naran, M.D. and triage nurse Susan George" and "Woodhull Hospital doctors and nurses, including physician assistant Neena."  (*Id.*)

On March 12, 2012, Plaintiff submitted supplemental disclosures, providing the names and contact information of three eyewitnesses to the incident: "Romaine Dindyal, Dei Colon, and Traymain Jergin."[3]  (Pl. Supp. Disclosures, annexed to Sundaran Decl. as Ex. G.)  Plaintiff also

---

[2]  Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure provides, in relevant part, that, "a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information."  Fed R. Civ. P. 26(a)(1)(A)(i).

[3]  The names of the eyewitnesses were misspelled in this disclosure.  The corrected spellings are:  Romain Dindyal (*see* Transcript of the Deposition of Romain Dindyal ("Romain Dindyal Dep."), annexed to Sundaran Decl. as Ex. P), Deirdre Colon, (*see* Transcript of the Deposition of Deirdre Colon ("Colon Dep."), annexed to Sundaran Decl. as Ex. L), and Tremaine Jernigan, (*see* Statement by Tremaine Jernigan ("Jernigan Stmt."), annexed to Sundaran Decl. as Ex. J.)

gave Defendants handwritten eyewitness statements from these three witnesses. (Statement by Romain Dindyal ("Romain Dindyal Stmt."), annexed to Sundaran Decl. as Ex. H; Statement by Deirdre Colon ("Colon Stmt."), annexed to Sundaran Decl. as Ex. I; Statement by Tremaine Jernigan ("Jernigan Stmt."), annexed to Sundaran Decl. as Ex. J.) Each of the handwritten statements indicate that on February 27, 2008, the affiant observed certain police officers hitting Plaintiff with a walkie-talkie and kicking and punching Plaintiff before later arresting him. (*See* Romain Dindyal Stmt.; Colon Stmt.; Jernigan Stmt.)

On July 3, 2012, Defendants moved to compel the contact information for Jernigan and Romain Dindyal, and to preclude Colon from testifying at trial. (Def. Sec. Mot. to Compel, Docket Entry No. 32.) Defendants informed Judge Levy that while Plaintiff purported to provide the current contact information for Jernigan and Romain Dindyal, Defendants had been unable to locate them in order to serve them with subpoenas to appear for depositions. Defendants also told Judge Levy that Colon informed counsel for the City that she did not want to be involved in the case. Defendants requested that Colon's testimony be precluded at trial, because of her unwillingness to testify. (*Id*. at 2.)

On July 13, 2012, Judge Levy ordered Plaintiff to provide the contact information for Jernigan and Romain Dindyal. (Minute Entry dated July 13, 2012.) Judge Levy further ordered Defendants to serve a subpoena on Colon directing her to appear at a deposition. (*Id*.)

### c. Allegations of witness tampering

At an October 18, 2012 status conference before Judge Levy, Defendants informed him that Colon provided conflicting affidavits and witness statements. (Minute Entry dated Oct. 18, 2012.) Judge Levy reopened discovery for the purpose of deposing Colon, her attorney, and

nonparty witness Felicia Dindyal[4] regarding this allegation.

Two months later, Defendants told Judge Levy of possible witness tampering and solicitation allegations by Colon.  (Def. Mot. to Compel 1–2, Docket Entry No. 33.)  According to Defendants, Colon admitted that she never witnessed Plaintiff's arrest or his interaction with police officers on the date of the incident.  (*Id.* at 1.)  Colon alleged that Felicia Dindyal, Plaintiff's fiancée, "fraudulently induced" her to sign the eyewitness statement corroborating Plaintiff's claims against Defendants.  (*Id.*)  Defendants further advised Judge Levy that Colon's new allegations that she did not witness the incident were corroborated by Colon's attorney. (*Id.*)  Defendants requested that the Court compel Plaintiff to provide Felicia Dindyal's contact information and for an extension of the discovery deadline to fully explore these allegations.[5] (*Id.* at 3.)

Plaintiff objected to Defendants' request for an extension of the discovery deadline.  (Pl. Resp. to Mot. to Compel, Docket Entry No. 34.)  Plaintiff asserted that Defendants' allegations constituted "triple hearsay" and that there was no evidence that Felicia Dindyal improperly procured Colon's contested statement.  (*Id.* at 1–2.)  Plaintiff also argued that Colon had been unable to identify who allegedly induced her to write the statement and challenged Defendants' conclusion that it was Felicia Dindyal.[6]  (*Id.*)  Judge Levy granted Defendants' motion to extend

---

[4]  As discussed *infra* in Part II.b.i., Felicia Dindyal had a relationship with each of the purported eyewitnesses — one of whom is her brother, Romain Dindyal.  To avoid confusion, the Court will refer to Felicia Dindyal and Romain Dindyal by their full names.

[5]  Defendants also requested an extension of the discovery deadline due to difficulties in serving the deponents, including Colon.  (Def. Mot. to Compel 3, Docket Entry No. 33.)

[6]  Plaintiff claimed that Colon's attorney did not "name" Felicia Dindyal as the person who "allegedly deceived [Colon] to write and notarize her statement," because Colon "did not know the name of the person."  (Pl. Resp. to Mot. to Compel 1.)  According to Plaintiff,

discovery and noted that information obtained from Colon's attorney at his deposition

"justif[ied] deposing" both Colon and Felicia Dindyal. (Minute Entry dated Dec. 20, 2012.)

Colon was deposed by the parties on February 26, 2013. (Def. Mem. of Law in Opp'n to

Pl. Objections ("Def. Opp.") 8, Docket Entry No. 60.) After her deposition, Defendants "noted

glaring similarities in the statements offered by Ms. Colon, Mr. Dindyal [and] Mr. Jernigan."

(*Id.*) According to Defendants, the similarities "strongly suggested that all three statements were

concerted and coordinated by [P]laintiff and others working on his behalf." (*Id.*)

### d. June 6, 2013 hearing

On June 6, 2013, Judge Levy heard testimony from Colon and Felicia Dindyal regarding

the witness tampering allegations. (Transcript of June 6, 2013 Hr'g ("Tr."), Docket Entry No.

48.) Colon testified that she did not observe the incident between Plaintiff and Defendants, (Tr.

18:2–4), and had not written the eyewitness statement regarding the incident, (Tr. 16:21–23).

Colon admitted that she did sign the statement, had it notarized, and provided it to Plaintiff at the

behest of Felicia Dindyal, (Tr. 16:14–17:6), but could not recall who provided her with the

statement for her signature, (Tr. 96:11–14). Colon did not know who wrote the statement.[7] (*See*

Tr. 15:15–17.) Colon testified that she had agreed to serve as a "character witness" in support of

Plaintiff's case but had been promised by both Plaintiff and Felicia Dindyal that she would not

have to testify in court or at a deposition. (Tr. 40:4–42:22.) Felicia Dindyal testified that she did

not ask Colon to write an eyewitness statement and that she did not give Colon the statement,

(Tr. 114:22–115:6), nor did she know who wrote the statement, (Tr. 115:16–17). Plaintiff did

---

Defendants "surmised that it must be [Felicia Dindyal] because the person who allegedly
procured the statement was a woman and was Hispanic and Ms. Dindyal is Hispanic." (*Id.*)

[7] Colon testified at her deposition that she did not know if Felicia Dindyal wrote the
statement, and that Felicia Dindyal did not tell her who wrote the statement. (Colon Dep.
50:5−8.)

not testify at the June 6, 2013 hearing.

Felicia Dindyal and Colon testified that during the relevant time period, Plaintiff shared a telephone with Felicia Dindyal ("shared telephone"). (Tr. 127:11–12; *see also* Tr. 127:16–18 (testimony from Felicia Dindyal confirming that Plaintiff sent text messages from their shared telephone).) Both Colon and Felicia Dindyal were questioned about certain text messages between Colon and the shared telephone that were exchanged between March 2012 and July 2012, which were offered into evidence by Defendants. (Text Messages, annexed to Sundaran Decl. as Ex. R.) The text messages include exchanges in July 2012 where either Felicia Dindyal or Plaintiff, using the shared telephone, asked Colon to speak with Plaintiff's attorney. (Text Messages at NYC621–25.) Felicia Dindyal testified that four of the text messages to Colon were authored by Plaintiff: (1) a July 13, 2012 message sent at 11:36 AM stating, "Call me back dei gotta ask you something[;]" (2) another message of the same date sent at 12:43 PM stating "Call me please[;]" (3) a July 23, 2012 message sent at 10:59 PM stating, "Hey dei How are u Ques did the lawyer call u;" and (4) a July 23, 2012 message sent at 11:03 PM stating "Ok do u think u have time 2morrow for a confrence call with us on the line[?]" (*Id*. at NYC620–21.) On July 23, 2012, Colon sent a return text message stating, "[You] know when [I] agreed to this [I] thought it was explained [I] wouldn't have to testify or have involvement in depositions . . . [I] honestly don't feel comfortable with where its headed . . . [I] should['ve] thought it through before [I] agreed." (*Id*. at NYC624.) Colon testified that she sent this message to Felicia Dindyal, and that at the time she felt "lied to and misled" because she thought her involvement in Plaintiff's case would not require interactions with attorneys, and that she "no longer wanted to be involved" in the case. (Tr. 42:1–43:3.) This message was followed by two responses stating, "[You] don't have to do that" and "Let [A]lex explain it again[,] they say things to scare people[,] like that

saying[,] [p]ressure bust pipes." (Text Messages at NYC625.) Felicia Dindyal testified that she did not recall seeing these messages and that she did not write them, (Tr. 149:1–151:19), and "assum[ed]" they were written by Plaintiff, (Tr. 153:18–20). However, Colon testified that Felicia Dindyal sent her these messages asking her to "[l]et [Plaintiff] explain it again." (Tr. 43:3–9.)

Felicia Dindyal and Colon were also questioned about a different July 23, 2012 text message from the shared telephone to Colon which stated in pertinent part: "Its cool when I asked people in the beginning everybody was cool with it[,] now when presure [sic] rises everyone wants to hide what else . . . [i]s new . . . . [I]ts paper work not life or death." (Text Messages at NYC627.) According to Colon, Felicia Dindyal sent her this message. (Tr. 48:7–12.) Felicia Dindyal denied sending this message. (Tr. 154:24–155:4.)

Defendants moved for sanctions alleging witness tampering by Plaintiff and sought a referral to the United States Attorney's Office for criminal investigation into the allegations. (Tr. 2:25–3:20.)

### e. The parties' proposed findings of fact and conclusions of law

#### i. Defendants' submission to Judge Levy

On July 25, 2013, Defendants submitted proposed findings of fact and conclusions of law in support of their motion for sanctions. (Def. Prop. Findings of Fact and Conclusions of Law, Docket Entry No. 49.) Defendants proffered the following facts — (1) all three of the non-party eyewitnesses had a relationship with Plaintiff's fiancée Felicia Dindyal, including Colon who Defendants stated were "friends prior to Ms. Colon signing her purported eyewitness statement;" (2) there are similarities in the three eyewitness statements and Plaintiff's deposition testimony, including the fact that each reported hearing a "loud screeching sound" when the police arrived,

observing a "white male" grabbing a walkie talkie and hitting Plaintiff with it, and observing a Hispanic man handcuff, kick and punch Plaintiff; and (3) in the statements by both Jernigan and Colon, waistband is incorrectly spelled as "waste band" and walkie talkie is incorrectly spelled as "walkey talkey." (*Id.* at 5–7.) Defendants also emphasized the fact that Plaintiff, Felicia Dindyal and Colon exchanged text messages about Colon's statement between March 2012 and July 2012, including a July 23, 2012 text message from Colon stating that she did not feel comfortable with her involvement in the case as she thought that her involvement would not include providing testimony or interactions with attorneys. (*Id.* at 8.) Defendants noted that Colon had denied the entirety of her purported eyewitness statement. (*Id.* at 10–11.) Defendants concluded that based on their proposed findings of fact, "it cannot be disputed that [P]laintiff and Felicia Dindyal affirmatively solicited a false statement from Ms. Colon in order to benefit [P]laintiff's case" as Plaintiff and Felicia Dindyal "persuaded and misled Ms. Colon into believing that she would not have to attend a deposition, that there would be no court involvement . . . and that they would help Ms. Colon with her own case." (*Id.* at 12–13.) Defendants requested that Judge Levy dismiss the Amended Complaint pursuant to Rules 41(b) and 37 of the Federal Rules of Civil Procedure, as well as the Court's inherent power. (*Id.* at 13−14.)

### ii. Plaintiff's submission to Judge Levy

On October 8, 2013, Plaintiff submitted his proposed findings of fact and conclusions of law to Judge Levy. (Pl. Prop. Findings of Fact and Conclusions of Law, Docket Entry No. 55.) Plaintiff noted that Colon provided conflicting testimony concerning the circumstances that led her to sign the eyewitness statement, the identity of the person who provided her with the statement, and how the statement was provided to her. (*Id.* at 2–5.) Plaintiff also noted that

Colon testified that the only time she ever saw Plaintiff was when he picked up the notarized statement from her. (*Id.* at 4.) Plaintiff argued that that there was insufficient evidence to show witness tampering and that without proof that Plaintiff committed fraud on the court, this action should not be subject to dismissal. (*Id.* at 8–12.)

### f. Report and Recommendation

On November 4, 2013, Judge Levy issued his R&R, recommending that this action be dismissed as a sanction for Plaintiff's involvement in witness tampering. Judge Levy identified the following as "undisputed" facts: (1) "the handwritten witness statement Ms. Colon signed is false;" (2) "[P]laintiff spoke with Ms. Colon by phone about the written statement;"[8] (3) "[P]laintiff personally went to Ms. Colon's home to pick up the notarized statement;" and (4) "[P]laintiff sent Ms. Colon text messages in July 2012, urging her to speak with his attorney."[9] (R&R 5.)

Judge Levy determined that it "strains credulity to believe" that Colon wrote and signed a false eyewitness statement in support of Plaintiff — a man she had never met — and then "abruptly" disavowed the statement when faced with the prospect of a deposition. (*Id.* at 7.) Instead, Judge Levy stated that it was "abundantly clear" that Colon signed the statement "at the behest of her friend and [P]laintiff's fiancée," Felicia Dindyal. (*Id.*) Judge Levy concluded that the "obvious inference" based on the facts presented was that "[Plaintiff] knew that Ms. Colon's

---

[8] Although Plaintiff argues in his objections to the R&R that "[t]here is no testimony that [Plaintiff] ever had any actual conversation with . . . Colon before picking up the statement," Plaintiff testified during his deposition that he spoke with Colon by telephone to let her know that he would be collecting the statement. (Transcript of the Deposition of Alexander Riley 46:16–20 ("Pl. Dep."), annexed to Sundaran Decl. as Ex. M.)

[9] Plaintiff does not appear to concede this fact. At the June 6, 2013 hearing before Judge Levy, Colon and Felicia Dindyal provided conflicting testimony as to whether certain text messages were authored by Plaintiff or Felicia Dindyal. However, there is no dispute that the text messages were sent from the telephone shared by Plaintiff and Felicia Dindyal.

statement was false when he took affirmative steps to obtain it" and when he urged Ms. Colon to speak with his attorney. (*Id.* at 8.) Judge Levy supported his conclusion with several facts — that all three of the purported eyewitnesses had "close ties" to Plaintiff's fiancée, Felicia Dindyal; that Plaintiff did not identify Colon or either of the other two alleged eyewitnesses until two years after commencing this lawsuit; and that Plaintiff has not denied being involved in persuading Colon to make a false statement. (*Id.*) Judge Levy recognized that "[d]ismissal of a lawsuit is an extreme sanction, and one that must be exercised with great restraint," but concluded that dismissal was appropriate in this case "to address and deter" witness tampering. (*Id.*)

### g. Plaintiff's objections to the Report and Recommendation

Plaintiff timely filed objections to Judge Levy's R&R on November 18, 2013. (Pl. Obj., Docket Entry No. 59.) Plaintiff argues, among other things, that Judge Levy improperly resolved disputed facts in favor of the City, Colon is an unreliable witness who provided a false eyewitness statement because she was "against police misconduct," and there is insufficient evidence to find that Plaintiff "willfully tried to deceive the court," committed "fraud on the court" or committed witness tampering. (*Id.*) Plaintiff also argues that Judge Levy erred in recommending dismissal. According to Plaintiff, the appropriate remedy would be to allow the jury to weigh the "value and relevance" of Colon's witness tampering allegations, and if necessary, instruct the jury that they could draw an adverse inference against Plaintiff based on the alleged witness tampering. (*Id.* at 11–12.) Plaintiff additionally argues that "in light of a perjured witness's testimony . . . whose story on many critical facts changed many times, dismissal would be too drastic a remedy in this case." (*Id.* at 11.)

## II.    Discussion

### a.  Standards of Review

#### i.  Report and Recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review.  28 U.S.C. § 636(b)(1)(C); *see also Larocco v. Jackson*, No. 10-CV-1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  28 U.S.C. § 636(b)(1)(C); *see also Larocco*, 2010 WL 5068006, at *2.   The clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates its original arguments.  *See Rahman v. Fischer*, No. 10-CV-1496, 2014 WL 688980, at *1 (N.D.N.Y. Feb. 20, 2014) ("If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error." (citations omitted)); *Time Square Foods Imports LLC v. Philbin*, No. 12-CV-9101, 2014 WL 521242, at *2 (S.D.N.Y. Feb. 10, 2014) (clearly erroneous standard applies when party reiterates arguments made to the magistrate judge); *see also DePrima v. City of N.Y. Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *3 (E.D.N.Y. Mar. 20, 2014) (collecting cases).

### ii. Sanctions

#### 1. Courts' inherent power to sanction

A court has the inherent power to sanction a party "for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. "Sanctionable conduct must be proven by clear and convincing evidence and the district court must make a specific finding of bad faith." *Amerisource Corp. v. RX USA Int'l Inc.*, No. 02-CV-2514, 2010 WL 2730748, at *5 (E.D.N.Y. July 6, 2010) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)). "Moreover inherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). "Although not capable of precise definition, clear and convincing evidence has been described as evidence which produced in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Int'l Controls & Measurements Corp. v. Watsco, Inc.*, 853 F. Supp. 585, 587 (N.D.N.Y. 1994) (citation omitted). "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Scivantage*, 564 F.3d at 114. "[R]equests for sanctions following witness tampering are not common in federal court," however, courts in this district and others have sanctioned witness tampering pursuant to a court's inherent power. *Harris v. SCA Rest. Corp.*, No. 09-CV-2212, 2014 WL 996249, at *4 (E.D.N.Y. Mar. 14, 2014); *see In re Brican Am. LLC Equip. Lease Litig.*, 977 F. Supp. 2d 1287, 1291–92 (S.D. Fla. 2013) ("The Court's authority to issue sanctions based upon [perjury and witness tampering] is not predicated upon a determination of criminal guilt . . . but instead upon

the Court's inherent power."); *see Qantum Communs. Corp. v. Star Broad.*, 473 F. Supp. 2d

1249, 1269 (S.D. Fla. 2007) ("[T]he inherent powers doctrine is most often invoked where a

party commits perjury or destroys or doctors evidence.").

### 2. Rule 37

A court can also impose sanctions "in response to abusive litigation practices" pursuant

to Rule 37 of the Federal Rules of Civil Procedure. *Friends of Animals v. U.S. Surgical Corp.*,

131 F.3d 332, 334 (2d Cir. 1997) (citing *Penthouse Int'l Ltd. v. Playboy Enters.*, 663 F.2d 371,

386 (2d Cir. 1981)); *see also Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)

("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide

discretion in sanctioning a party for discovery abuses . . . ." (citing *N.Y. State Now v. Terry*, 886

F.2d 1339, 1354 (2d Cir. 1989))). A dismissal pursuant to Rule 37 "is a drastic remedy meant

only for extreme circumstances, [but] it is warranted . . . where a party fails to comply with the

court's discovery orders willfully, in bad faith, or through fault." *Musgrave v. Wolf*, 136 F.

App'x 422, 423–24 (2d Cir. 2005) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods.,

Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)) (internal quotation marks omitted).

### 3. Rule 41(b)

Pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, a court may "dismiss a

complaint for failure to comply with a court order, treating the noncompliance as a failure to

prosecute." *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995). Dismissal pursuant to Rule

41(b) is a "harsh remedy" and "appropriate only in extreme situations." *Russell v. Rao*, 531 F. App'x. 175, 176 (2d Cir. 2013) (quoting *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996)).[10]

### b. Witness tampering

Witness tampering occurs when a person "knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person with intent to influence, delay, or prevent the testimony of any person in an official proceeding . . . ." 18 U.S.C. § 1512(b)(1). This statute "does not require 'physical force' or 'threats' to support a [finding] of tampering, . . . corrupt influence is sufficient" to show a violation. *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000). The Second Circuit has defined corrupt influence to mean "attempts to persuade . . . motivated by an improper purpose." *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996). "By targeting only such persuasion as is 'corrupt[,]' [Section] 1512(b) does not proscribe lawful or constitutionally protected speech and is not overbroad." *Id.*

There are no allegations that Plaintiff attempted to influence Colon's testimony through physical force or threats.[11] At issue is whether Plaintiff "corruptly persuaded" Colon to provide false testimony in support of his case. *See* 18 U.S.C § 1512(b)(1). Defendants argue that Plaintiff and Felicia Dindyal "corruptly persuade[d]" Colon to provide a false eyewitness

---

[10]  Judge Levy based his recommendation for sanctions on the "court's inherent power to fashion an appropriate sanction for conduct which abuses the judicial process." (R&R 6 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).) Since the parties do not dispute the legal basis for Judge Levy's conclusion that the Court has the authority to issue sanctions based on allegations of witness tampering pursuant to its inherent power, the Court analyzes the propriety of the requested sanctions pursuant to its inherent authority.

[11]  In fact, Colon has expressly denied that Plaintiff or Felicia Dindyal ever threatened her in an effort to influence her testimony. (Colon Dep. 96:8–12; Tr. 96:24–97:8.) She has also denied that she was ever offered money, gifts or any other benefits in exchange for her involvement in Plaintiff's case. (Tr. 96:15–17.)

statement by "misle[ading] [her] into believing that she would not have to attend a deposition, that there would be no court involvement and, further, that they would help Ms. Colon with her own case."[12] (Def. Opp'n. 16.) According to Defendants, Plaintiff "affirmatively solicited a false statement from Colon in order to benefit [P]laintiff's case." (*Id.*) Judge Levy concluded that based on the evidence presented, "the obvious inference" was that Plaintiff knew Colon's statement was false when he "took affirmative steps to obtain it and when he urged her to participate in a conference call with his attorney." (R&R 8.)

The Court credits the "undisputed facts" identified by Judge Levy: (1) the purported statement by Colon is false; (2) Plaintiff spoke with Colon about the statement; (3) Plaintiff collected the statement from Colon; and (4) Plaintiff urged Colon to speak with his attorney in 2012 after the statement was produced in discovery.[13] (R&R 5.) Judge Levy relied on certain facts to conclude that Plaintiff knew that Colon's statement was false when he offered it as evidence, namely: (1) the relationship or "close ties" between the three eyewitnesses and Plaintiff's fiancée, Felicia Dindyal; (2) Plaintiff's two-year delay in identifying the three eyewitnesses; and (3) Plaintiff's decision to not testify at the June 6, 2013 hearing or otherwise deny the witness tampering allegations. Having reviewed the facts relied on by Judge Levy to

---

[12] Regarding the allegations that Plaintiff and Felicia Dindyal offered to help Colon with her own legal case, Defendants appear to be referencing a March 9, 2012 text message sent to Colon from the shared telephone stating: "We can do something tomorrow when [I] get out and [A]lex can help you with your situation with [your] case." (Text Messages at NYC618.) Colon testified that she did not receive any benefit in exchange for her statement. (Tr. 96:15–17.)

[13] Plaintiff argues that "[t]here is no testimony that [he] ever had any communications with . . . Colon before picking up the statement." (Pl. Obj. 8.) However, in finding that Plaintiff spoke with Colon about the statement, Judge Levy relied on Plaintiff's testimony at his deposition that he spoke with Colon on the telephone prior to picking up the statement to let her know that he was on his way to do so. (R&R 5 (citing Pl. Dep. 46).)

reach his conclusion, the Court concludes that the evidence supports a finding of witness tampering.

### i. The relationship between Plaintiff, Plaintiff's fiancée and the eyewitnesses

Judge Levy noted that Plaintiff "knew or should have known" that all of the eyewitnesses had "close ties" to Felicia Dindyal, and concluded that "[n]o reasonable person would believe that this was pure coincidence." (R&R 8.) It is undisputed that each of the three purported eyewitnesses had a relationship with Felicia Dindyal, Plaintiff's fiancée and mother of his child. As described below, the record supports this finding, and together with other evidence suggesting Plaintiff's involvement in wrongdoing, supports the inference that Felicia Dindyal *and* Plaintiff knew that Colon's statement was false when Plaintiff offered it as evidence and when he urged Colon to speak with his attorney about the statement, thereby committing witness tampering.

Romain Dindyal, one of the three eyewitnesses, is Felicia Dindyal's older brother. (Pl. Dep. 265:17–22.) Jernigan, another of the three eyewitnesses, testified during his deposition that he was "close" with Felicia Dindyal's family and considers her a friend. (Jernigan Dep. 26:5–8, 12–16.) Jernigan further testified that he has known Felicia Dindyal since junior high school and that in 2010, he rented an apartment from Felicia Dindyal's family. (*Id*. at 10:17–19, 11:21−12:6.) The apartment Jernigan rented during this time was located in the basement of the house where Felicia Dindyal and her family lived. (*Id*. at 13:11–12, 14:18–15:8.)

The evidence in the record also demonstrates that at the time that Colon provided her statement to Plaintiff, Felicia Dindyal and Colon had mutual acquaintances and socialized together on several occasions. (Tr. 30:17–21 (Colon testimony stating that she was "friendly" with Felicia Dindyal); Tr. 32:14–17 (Colon testimony stating that she did not spend "one on one"

time with Felicia Dindyal but would socialize with Felicia Dindyal with a mutual friend);

Tr. 135:8–19 (testimony by Felicia Dindyal stating that they saw each other at gatherings)).)

Colon testified that she met Felicia Dindyal in 2009 or 2010, and that by 2012, she would

communicate with Felicia Dindyal over the telephone occasionally. (Tr. 31:21–32:1, 35:6−14.)

Defendants argue that the 2012 text messages between Colon and Felicia Dindyal demonstrate

that they had a "social relationship," (Tr. 124:11–15), which is consistent with the testimony of

Colon and Felicia Dindyal.

    Even without evidence that the eyewitnesses were as close to Plaintiff as they were to

Felicia Dindyal,[14] the Court agrees that "[n]o reasonable person would believe that [it] was pure

coincidence" that the eyewitnesses to Plaintiff's alleged assault all happen to have a relationship

with his fiancée.[15] (R&R 8.) As Judge Levy found, the possibility that Colon, who did not know

Plaintiff or Felicia Dindyal at the time of Plaintiff's arrest, and who met Plaintiff for the first

time when she provided him with the signed eyewitness account, would offer a false statement in

---

[14] There is less evidence showing a close relationship between the eyewitnesses and
Plaintiff. Each of the eyewitnesses knew of Plaintiff at the time of the alleged incident or at the
time the eyewitness statements were provided, (Roman Dindyal Stmt. 1 (indicating that Plaintiff
and Romain Dindyal went to barbershop together); Jernigan Dep. 30:12–18; Tr. 36:3–10),
however, two of the three witnesses do not appear to have had a close relationship with Plaintiff,
(Tr. 36:3–18 (Colon's testimony that she did not "personally know" Plaintiff); Jernigan Dep.
31:8–12, 32:17–19 (Jernigan's testimony that he could not recall whether he had ever "hung out"
with Felicia Dindyal and Plaintiff together but that he never socialized with Plaintiff without
Felicia Dindyal).) Notably, Colon never met Plaintiff prior to Plaintiff collecting her statement.
(*See* Tr. 36:7–10 (testifying that prior to interacting with Plaintiff regarding the statement, she
never met him).) Nevertheless, as all of the eyewitnesses were close to Felicia
Dindyal — Plaintiff's fiancée and mother of his child — the Court agrees with Judge Levy's
conclusion that the relationships between the eyewitnesses and Felicia Dindyal could not have
been a coincidence.

[15] The Court notes that the City has not moved for sanctions based on allegations of
witness tampering as to the other two eyewitness statements. Accordingly, the Court makes no
findings as to the statements by Romain Dindyal and Jernigan, and refers to them only because
Judge Levy relied on the relationship between all three of the eyewitnesses, as well as the fact
that all three statements were provided at the same time, in reaching his conclusion.

support of Plaintiff's case of her own accord, strains reality. The obvious conclusion is, as Colon testified to at the hearing before Judge Levy, that Colon offered this statement because Felicia Dindyal asked and encouraged her to do so. Moreover, the fact that Felicia Dindyal is Plaintiff's fiancée and mother of his child, and shares a telephone with him, which telephone was used to communicate text messages with Colon, together with the evidence discussed below — Plaintiff's delay in identifying the three witnesses and his failure to deny the allegations of witness tampering — supports the inference that Plaintiff knew that his fiancée had solicited a false statement on his behalf at the time that he was attempting to offer the false statement as evidence.

### ii. Plaintiff's delay in identifying the three eyewitnesses

Judge Levy found that "Plaintiff knew that he did not see Ms. Colon at the scene of his arrest, and in his first responses to [D]efendants' interrogatories, he did not identify Colon (or either of the other two alleged eyewitnesses) as a person who witnessed, was present at, or had knowledge of the incident." (R&R 8.) "Instead, [P]laintiff first identified Mr. Dindyal, Mr. Jer[nigan] and Ms. Colon as eyewitnesses in March 2012, almost two years after initiating his case." (*Id.*) Judge Levy noted that Plaintiff did not identify any of these witnesses in his interview with the Civilian Complaint Review Board on March 5, 2010. (*Id.* at 8, n.8.) Plaintiff does not dispute these allegations. Instead, Plaintiff argues that no inference should be drawn from the "simple fact that [P]laintiff who was incarcerated in State prison when his case was filed [,] did not provide [the] names of the [eye]witnesses but was able to do so when he was released [from prison] and was able to canvass for witnesses." (Pl. Obj. 5.) Plaintiff thereby suggests that his delay in identifying Colon as a witness was due to his inability to "canvass" for witnesses during his incarceration.

Plaintiff's explanation fails to rebut Judge Levy's conclusion. Plaintiff does not offer any specific information as to when or how he learned about Colon as a witness to the incident that would explain why he could not identify her until his release from incarceration. Plaintiff provided the names of other witnesses while he was incarcerated. (Pl. Disclosures; Pl. Resp. to Def. First Set of Interrog. 1.) Moreover, the fact that Colon had a relationship with Plaintiff's fiancée, which began prior to his release from prison,[16] undercuts Plaintiff's assertion that he needed to "canvass for witnesses" after his release from incarceration and therefore could not have identified her sooner. Given Colon's connection to Felicia Dindyal, she should have been an easy witness for Plaintiff to identify, notwithstanding his incarceration. The fact that Colon was not identified until *after* Plaintiff was released from prison, in addition to Plaintiff's statement that he had to "canvass for witnesses," supports the inference that Plaintiff was involved in encouraging or soliciting Colon to offer a false statement.

### iii. Plaintiff's failure to testify at the June 6, 2013 hearing

Judge Levy also found that Plaintiff engaged in witness tampering based on the fact that Plaintiff did not testify at the June 6, 2013 hearing. Judge Levy noted that "although [Plaintiff] has had ample opportunity to do so, [he] has not denied his involvement in persuading Ms. Colon to make a false statement . . . . [h]e did not testify at the hearing on June 6, 2013 . . . and he has not submitted an affidavit in opposition to [D]efendants' motion." (R&R 8.)

Unlike in a criminal proceeding, the "Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Louis Vuitton Malletier S.A. v. Ly USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Moreover, "[a]n adverse

---

[16] Colon testified that she first met Felicia Dindyal in 2009 or 2010. (Tr. 31:21–32:1.)

inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *Libutti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999). However, a party's "silence is only one of a number of factors to be considered by the finder of fact in assessing a penalty, and [it is to be] given no more probative value than the facts of the case warrant." *Nu-Chem Labs., Inc. v. Dynamic Labs., Inc.*, No. 96-CV-5886, 2001 WL 35981560, at *19 (E.D.N.Y. Mar. 30, 2001) (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977)); *see also S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (noting that "the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case"). Plaintiff did not testify at the June 6, 2013 hearing denying his involvement in the alleged witness tampering. Nor did Plaintiff submit an affidavit denying his knowledge or involvement in the alleged witness tampering. This is relevant and persuasive evidence in support of Defendants' claim that Plaintiff was involved in procuring Colon's false statement.

In sum, the Court finds that the facts identified by Judge Levy — the relationships between Felicia Dindyal and Colon, as well as the other eyewitnesses, Plaintiff's delay in identifying the three witnesses, and Plaintiff's failure to testify at the June 6, 2013 hearing or otherwise deny his involvement in the alleged witness tampering — constitute clear and convincing evidence that Plaintiff was involved in procuring the false statement from Colon. The Court therefore adopts the portion of the R&R finding that Plaintiff was involved in encouraging or soliciting Colon to offer a false statement.

### c. Sanctions

Judge Levy recommended that the Court dismiss the instant action as a sanction against Plaintiff, finding dismissal to be the sanction "best tailored to address and deter this type of misconduct." (R&R 8–9.) Judge Levy acknowledged that "[d]ismissal of a lawsuit is an

extreme sanction, and one that must be exercised with great restraint," and noted that monetary sanctions in this case are unlikely to remedy the harm or deter others from engaging in this misconduct effectively, and "there is no witness to bar or exclude" as a sanction because the false testimony "never came to fruition." (R&R 9.)

District courts have wide discretion in determining the appropriate sanction for discovery abuses pursuant to their inherent powers. *Reilly*, 181 F. 3d at 267. The Second Circuit has recognized that because dismissal of an action is a "'drastic remedy, it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions.'" *Metro Found. Contractors, Inc. v. Arch Ins. Co.*, 551 F. App'x 607, 610 (2d Cir. 2014) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d. Cir. 1999)). Here, the Court, having considered less drastic sanctions, declines to adopt Judge Levy's recommendation to dismiss this action. Instead, the Court finds that monetary sanctions, *in addition to* notifying the jury of Plaintiff's witness tampering and permitting the jury to draw an adverse inference against Plaintiff based on the witness tampering allegations, are appropriate sanctions.

Colon's admission to Defendants that her eyewitness statement was fabricated spurred the parties' motion practice on this issue, requiring an evidentiary hearing and delaying the litigation. In the absence of such witness tampering, the litigation could have proceeded without delay. Consequently, the Court finds that monetary sanctions in the form of attorneys' fees and costs associated with the instant motion are appropriate and necessary. Defendants are ordered to submit an accounting of any costs for the instant motion, as well as contemporaneous time records documenting the dates worked, hours expended, and nature of work performed by the attorneys who assisted on the motion for sanctions. Defendants shall include as to each attorney, their position and years of experience.

The Court agrees with Judge Levy that monetary sanctions are not sufficient to deter this type of misconduct. Accordingly, the Court finds that it is also necessary to permit an adverse inference jury instruction. An adverse inference is a severe sanction that is "reserved for egregious conduct or for situations in which the loss of relevant evidence has so prejudiced the moving party that . . . an adverse inference is necessary to restore the moving party to its pre-loss position." *Riley v. Marriot Int'l, Inc.*, No. 12-CV-6242P, 2014 WL 4794657, at *7 (W.D.N.Y. Sept. 25, 2014) (collecting cases).[17] Here, the adverse inference will allow the jury to infer, but not necessarily conclude, that based on the fact that Plaintiff was involved in witness tampering, including the fact that Plaintiff has not denied such involvement, which resulted in the disclosure of Colon's false eyewitness statement, the other eyewitness accounts, which were submitted at the same time as Colon's, and which were also authored by individuals with ties to Felicia Dindyal, may also be fabricated. This sanction serves not only as a deterrent against similar misconduct by Plaintiff and others, but places the risk of an erroneous judgment based on this evidence on Plaintiff, counteracts any prejudice to Defendants resulting from the witness

---

[17] Given the lack of case law considering the imposition of sanctions as a result of witness tampering in a civil action, the Court has considered relevant law concerning the imposition of sanctions for spoliation and other discovery abuses. In order to impose an adverse inference instruction based on the destruction of evidence, the court must find "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d. Cir. 2012) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)) (internal quotation marks omitted). The Court finds these elements — in essence, requiring control, culpability, and relevance — are all present here. Where these elements are established, a district court may, pursuant to its discretion, "grant an adverse inference jury instruction insofar as such a sanction would 'serve [] [the] threshold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of the spoliation.'" *Id.* (alterations in original) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001)).

tampering, while still allowing Plaintiff's case to proceed on the merits. *See Riley*, 2014 WL 4794657, at *7 (finding adverse inference instruction appropriate and sufficient sanction for spoliation because it would deter party from similar future conduct, it would "shift the risk of an erroneous judgment to [sanctioned party] and . . . restore the [prejudiced party']s position in [the] litigation" and collecting cases); *Rodgers v. Rose Party Functions Corp.*, No. 10-CV-4780, 2013 WL 6002375, at *4 (E.D.N.Y. Nov. 12, 2014) ("[A]n adverse inference instruction advising the jurors that they may infer that the video recording [destroyed by defendants] would have corroborated plaintiff's allegations and rebutted defendants' assertions will suffice to restore plaintiff to the position she would have been in had the recording been preserved."). For these reasons, the Court declines to adopt Judge Levy's recommendation to dismiss this action as a sanction against Plaintiff.

### III.    Conclusion

For the foregoing reasons, the Court adopts the R&R in part and declines to adopt it in part. Defendants' motion for dismissal of the Complaint as a sanction is denied.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: February 10, 2015
         Brooklyn, New York